UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KYLE RICKWALT; BENJAMIN CHAVEZ; KAMERON CIERI; MAURILIO GONZALES, III; XAVIER GONZALEZ; ANGELO NAVARRO; ANDREW PINZON; SERGIO ESCOBAR on behalf of themselves and similarly situated employees,<br><br>Plaintiffs,<br><br>v.<br><br>DIRECT RECONDITIONING, LLC, a Georgia Limited Liability Corporation; DIRECT RECONDITIONING; ADESA, INC., a Delaware Corporation; ADESA California, LLC; a California Limited Liability Company, and DOES 1 to 100 inclusive,<br><br>Defendants. | No.  15-cv-01190-TLN-AC<br><br>**ORDER GRANTING PLAINTIFFS' MOTION TO REMAND** |

This matter is before the Court pursuant to Plaintiffs Kyle Rickwalt, Benjamin Chavez, Kameron Cieri, Maurilio Gonzales, III, Xavier Gonzalez, Angelo Navarro, Andrew Pinzon, and Sergio Escobar's (collectively "Plaintiffs") motion to remand.  (ECF No. 8.)  Defendants Direct Reconditioning, LLC, Direct Reconditioning, ADESA, Inc., and ADESA California, LLC (collectively "Defendants") have filed an opposition to Plaintiffs' motion, in addition to their

1

1   initial notice of removal.[1]  (ECF Nos. 1, 16.)  Plaintiffs have filed a reply.  (ECF No. 17.)  The

2   Court has carefully considered the arguments raised in Plaintiffs' motion to remand and reply, as

3   well as Defendants' opposition.  For the reasons set forth below, Plaintiffs' motion to remand is

4   GRANTED.

**FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY**

6       Plaintiffs were employed as detailing employees by Direct Reconditioning.[2]  (First

7   Amended Complaint, "FAC", ECF No. 1-3 ¶ 16.)

8       Direct Reconditioning "paid Plaintiffs and the rest of the detailing employees

9   approximately $1.25 per car that was vacuumed and washed only and approximately $3.00 per

10  car detailed in the interior and exterior.  Plaintiffs worked with approximately five (5) other

11  employees, detailing used cars, and splitting the earnings equally."  (FAC ¶ 18.)

12      Direct Reconditioning did not track the time that Plaintiffs worked or keep records of the

13  hours Plaintiffs worked.  (FAC ¶ 20.)

14      Plaintiffs were "required to work without pay at least once per month while detailing

15  BMWS or waiting for new cars to arrive from ADESA."  (FAC ¶ 21.)

16      Direct Reconditioning "scheduled Plaintiffs to work nine (9) to (12) hour workdays once

17  per month to work on BMW cars for ADESA, a company that provides and regulates auctions for

18  vehicles.  On these days, approximately 100 to 200 BMW cars were brought to Direct

19  Reconditioning to be detailed for auction.  After the auction, Direct Reconditioning and/or

20  ADESA instructed the detailing crew, including Plaintiffs, to 're-touch' the vehicles without

21  receiving pay for the time spent doing so."  (FAC ¶ 22.)

22      "Plaintiffs worked approximately four (4) to five (5) days per week.  Plaintiffs estimate

23  they worked over eight (8) hours per day during the week, and during the summer months,

24  including June to mid-August, Plaintiffs worked approximately five (5) to six (6) days per week

25  and more than forty (40) hours per week, without receiving overtime compensation.  Direct

26

27  [1] The removal notice is made by Defendants Direct Reconditioning, LLC and Direct Reconditioning; the ADESA
    Defendants consent to removal.  (ECF No. 1 at 1, n. 1.)

28  [2] The lower end of the relevant time period for employment is February 25, 2011.  (FAC ¶ 12.)

Reconditioning did not pay Plaintiffs overtime wages or overtime premiums earned." (FAC ¶ 23.)

"Plaintiffs took home paychecks [of] between $500 to $600 per month while working upwards of 100 to 150 hours per month. Plaintiffs were not paid the minimum wages of this State. Defendants failed to ensure that Plaintiffs were paid minimum wages for every hour that they worked. There were times that Plaintiffs has to perform follow-up cleaning or wait for work and were not compensated at all for their time." (FAC ¶ 24.)

Direct Reconditioning "provided Plaintiffs with a check that stated 'hours worked.' However, Plaintiffs do not know how Direct Reconditioning calculated said 'hours worked' nor do they know how the amount of pay was calculated." Accordingly, Plaintiffs' paystubs were not accurate and Plaintiffs were unable to determine the correct amount of wages owed. (FAC ¶ 25.)

"Direct Reconditioning did not schedule or authorize rest breaks for every four (4) hours worked. Direct Reconditioning directed Plaintiffs and other employees to take only one (1) break, a meal break, and nothing else. As of today, Plaintiffs have not received full compensation for all hours worked on an additional one (1) hour's worth of wages for each legally required rest period not authorized." (FAC ¶ 26.)

On February 25, 2015, Plaintiffs filed their complaint in the Superior Court of the State of California for the County of Sacramento. (ECF No. 1-1.) The complaint alleged a total of seven causes of action:

- (1) Failure to Pay Overtime Compensation (Cal. Lab. Code §§ 510, 1194);
- (2) Failure to Pay Minimum Wages (Cal. Lab. Code §§ 510, 1194);
- (3) Failure to Provide Rest Periods (Cal. Lab. Code § 226.7);
- (4) Wage Statement Violations (Cal. Lab. Code § 226(a));
- (5) Waiting Time Penalties (Cal. Lab. Code § 203);
- (6) Violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 et seq.);
- (7) Violations of California's Private Attorney General Act (Cal. Lab. Code § 2698 et seq.)

3

1    Defendants subsequently filed an Answer alleging defenses.  (ECF No. 1-2.)  On April 10, 2015,

2    Plaintiffs filed the FAC, adding an eighth cause of action: Violations of California Labor Code §

3    558.  (ECF No. 1-3.)  On May 29, 2015, Defendants ADESA, Inc. and ADESA California, LLC

4    filed an Answer to Plaintiffs' Amended Complaint.  (ECF No. 1-6.)

5            On June 2, 2015, Defendants filed a notice of removal of the case alleging this Court has

6    jurisdiction over the case pursuant to the Class Action Fairness Act ("CAFA").   (ECF No. 1.)

7    Currently, Plaintiffs have filed a motion to remand the case on the basis that the requirements of

8    CAFA are not met.  (ECF No. 8.)  Defendants have filed an opposition, and Plaintiffs have filed a

9    reply.  (ECF Nos. 16 & 17.)

10                                          **LEGAL STANDARD**

11           "[A]ny civil action brought in a State court of which the district courts of the United

12   States have original jurisdiction, may be removed by the defendant or the defendants, to the

13   district court of the United States for the district and division embracing the place where such

14   action is pending."  28 U.S.C. § 1441(a).  However, "[i]f at any time before final judgment it

15   appears that the district court lacks subject matter jurisdiction, the case shall be remanded."  28

16   U.S.C. § 1447(c).

17           Relevant to this action, CAFA gives federal district courts jurisdiction where: (1) the

18   matter in controversy exceeds the sum or value of $5,000,000; (2) the number of members of all

19   proposed plaintiff classes in the aggregate is 100 or greater; (3) and there is minimal diversity

20   between the defendants and plaintiffs.  28 U.S.C. § 1332(d).  (*See* ECF No. 1 at 4.)  "[N]o

21   antiremoval presumption attends cases invoking CAFA, a statute Congress enacted to facilitate

22   adjudication of certain class actions in federal court."  *Dart Cherokee Basin Operating Co., LLC*

23   *v. Owens*, 135 S. Ct. 547, 550 (2014).  "A defendant's notice of removal need include only a

24   plausible allegation that the amount in controversy exceeds the jurisdictional threshold," and does

25   not need to contain evidentiary submissions.  *Id.* 554.  However, when the controversy is

26   contested by plaintiffs, evidence establishing the amount is required, and the court must decide

27   where the preponderance lies.  *Id.*  The defendant can present his own estimate of the damages

28   and is not bound by plaintiff's estimates in the complaint.  *Frederick v. Hartford Underwriters*

                                                      4

*Ins. Co.*, 683 F.3d 1242, 1247 (10th Cir. 2012). "CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure." *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1198 (9th Cir. 2015).

**ANALYSIS**

Plaintiffs argue that Defendants do not meet the requirements of CAFA for the following reasons: (1) the amount in controversy is not in excess of $5,000,000; (2) there are not more than 100 class members; and (3) Defendants did not file their notice of removal on a timely basis. Plaintiffs also allege that even if Defendants met the requirements of CAFA, the Court should not exercise jurisdiction under the "Local Controversy and Home State" exceptions of CAFA.

As discussed below, with respect to the amount in controversy requirement, the Court finds the arguments and evidence presented by the parties places the preponderance below the $5,000,000.00 threshold. Therefore, the jurisdictional requirements are not met and the case must be remanded. The Court does not address the parties' arguments pertaining to the other requirements under CAFA.

**I.      Relevant Period for Calculation of Damages**

The parties dispute the period in which damages may be calculated for jurisdictional purposes. The FAC states the class shall be composed of: "All non-exempt employees who performed car detailing, cleaning, and body shop services who continue to be employed by Defendants and paid by Defendants within four (4) years prior to the filing of this Complaint and up to the present date." (FAC ¶ 12.)

Defendants, in their opposition, argue that damages may be calculated for a period that includes the time up to the filing of the notice of removal. They argue the above-cited language from the FAC intends to include damages up to the time the class is certified. On this point, Defendants reference *Mejia v. DHL Express (USA), Inc.*, 2015 WL 2452755, at *3 (C.D. Cal. May 21, 2015) ("Plaintiff suggests that there was something inappropriate about Defendant including in its estimate time after the date of the filing of the FAC. But Plaintiff chose to define the class period in the FAC as running up 'until the date of certification,' not the date of filing. []

5

1    Including post-filing time is not inconsistent with the allegations in the FAC.")

2            Plaintiffs argue that the proper time period for jurisdictional purposes is the time the initial

3    complaint was filed in state court, which would be February 25, 2015.  *See Std. Fire Ins. Co. v.*

4    *Knowles*, 133 S. Ct. 1345, 1349 (2013) (citing *Wisconsin Dept. of Corrections v. Schacht*, 524

5    U.S. 381, 390 (1998)) ("For jurisdictional purposes, our inquiry is limited to examining the case

6    'as of the time it was filed in state court'").  Plaintiffs also allege as follows in their reply

7    briefing: "Defendants corrected their unlawful practices on or around March 30, 2015.  Thus,

8    Defendants misrepresent to the Court that the amount in controversy has increased during the

9    period between the filing of the Complaint (February 25, 2015) and the date of the filing of the

10   Notice of Removal (June 2, 2015) because they insist on calculating the amount in controversy, as

11   if this correction did not occur."  (ECF No. 17 at 2.)  Plaintiffs attach declarations from two of the

12   named Plaintiffs, representing that as of March 30, 2015 (approximately one month after the

13   initial complaint was filed in state court) Defendants began paying for all hours worked, including

14   overtime hours worked and at legal rates.  Plaintiffs also provide paystubs for the period from

15   March 30, 2015, through April 12, 2015, which they state shows that the alleged illegal payment

16   practices stopped.  (Rickwalt Decl. & Cieri Decl., ECF Nos. 18 & 19; ECF No. 17 at 6–8.)

17           The Court follows the plain language from *Std. Fire Ins. Co. v. Knowles*, 133 S. Ct. at

18   1349: "For jurisdictional purposes, our inquiry is limited to examining the case 'as of the time it

19   was filed in state court,'" and so uses the date of the filing of the complaint in state court, on

20   February 25, 2015, as the cut-off period for calculating damages for jurisdictional purposes.

21   Assuming *arguendo* that the liability period can extend beyond that point, the Court considers the

22   damages calculation for the period between February 25, 2015, and March 30, 2015; however, as

23   stated more fully below, it is highly unlikely that adding damages for this short period would

24   cause the amount in controversy to go above $5,000,000.00.  While Defendants do not refute the

25   allegation that said illegal practices stopped as of March 30, 2015, the Court notes that Plaintiffs

26   made said allegation in their reply briefing so Defendants could not respond.  However,

27   Defendants' notice of removal itself uses the February 25, 2015 date when they could have used

28   the date of the removal itself or on or about June 2, 2015.  For those reasons, the Court notes but

does not address Defendants' arguments (in their opposition) that the amount in controversy should be increased from the amount stated in their notice of removal, based on the interval between February 25, 2015, and the date removal occurred on June 2, 2015.

## II.       Count 1: Overtime Wages

### A.   The FAC

In sum, Plaintiffs allege that Defendants failed to pay Plaintiffs all overtime wages due. The FAC states:

"Direct Reconditioning scheduled Plaintiffs to work nine (9) to (12) hour workdays once per month to work on BMW cars for ADESA, a company that provides and regulates auctions for vehicles.  On these days, approximately 100 to 200 BMW cars were brought to Direct Reconditioning to be detailed for auction.  After the auction, Direct Reconditioning and/or ADESA instructed the detailing crew, including Plaintiffs, to 're-touch' the vehicles without receiving pay for the time spent doing so."  (FAC ¶ 22.)

"Plaintiffs worked approximately four (4) to five (5) days per week.  Plaintiffs estimate they worked over eight (8) hours per day during the week, and during the summer months, including June to mid-August, Plaintiffs worked approximately five (5) to six (6) days per week and more than forty (40) hours per week, without receiving overtime compensation.  Direct Reconditioning did not pay Plaintiffs overtime wages or overtime premiums earned."  (FAC ¶ 23.)

"Plaintiffs took home paychecks [of] between $500 to $600 per month while working upwards of 100 to 150 hours per month.  Plaintiffs were not paid the minimum wages of this State … There were times that Plaintiffs had to perform follow-up cleaning or wait for work and were not compensated at all for their time."  (FAC ¶ 24.)

### B.   Defendants' Arguments

Defendants, in their Notice of Removal, state the amount of damages for Count 1 to be **$934,117.50**.  (ECF No. 1 at 9.)  Defendants reasoned as follows:  Plaintiffs state they seek wages for three years prior to the filing of the complaint.  (FAC ¶¶ 28–32.)  However, Plaintiffs' sixth cause of action, under California's UCL, seeks to extend the period of liability to four years.  *See*

7

1   Cal. Bus. & Prof. Code § 17208.  Therefore, Defendants use a four-year period of liability, from

2   February 25, 2011, through February 25, 2015.[3]

3       Plaintiffs seek overtime calculated at 1.5 times the rate of their regular pay.  *See e.g.* Cal.

4   Lab. Code § 510(a): "Eight hours of labor constitutes a day's work. Any work in excess of eight

5   hours in one workday and any work in excess of 40 hours in any one workweek and the first eight

6   hours worked on the seventh day of work in any one workweek shall be compensated at the rate

7   of no less than one and one-half times the regular rate of pay for an employee."  Cal. Lab. Code §

8   510 (West).

9       Regular pay in this case is minimum wage.  For part of the four year period, up to June 30,

10  2014, minimum wage in California was $8.00 per hour.  For the rest of the period, minimum

11  wage was $9.00 per hour.  (ECF No. 1 at 8.)  Therefore, the rate of overtime pay (1.5 times

12  minimum wage) would be $12.00 and $13.50 respectively.

13      The number of plaintiffs in the class also varied at intervals within the four year period.

14  Based on payroll records, Defendants determined the class to be composed of groups of eight

15  employees through August 31, 2011, then groups of 45 employees through the remainder of the

16  four-year period.  (ECF No. 1 at 9.)

17      Defendants also assumed for jurisdictional purposes that Plaintiffs worked an average of

18  two overtime hours per day.  (ECF No. 1 at 8.)

19      Essentially, Defendants' calculations considered the number of employees in the class

20  (ranging from 8 to 45 at any given interval), the number of overtime hours per week they worked

21  (2 overtime hours per day, where Plaintiffs are working 4 to 5 days per week during the Summer

22  months and 5 to 6 days per week during non-Summer months), the rate of pay per overtime hour

23  (1.5 times minimum wage), and the approximate number of weeks in the seasonal period

24  (Summer months vs. non-Summer months).

25      For example, for the period "Summer Months, June 1, 2011 through August 31, 2011",

26  _____

27  [3] Plaintiffs do not appear to object to the extension of four years of liability for the counts related to overtime wages, minimum wage, and rest periods (Counts 1, 2, and 3).  *See* FAC ¶ 58.  As a separate matter, it does not appear that the parties identify a calculation error in each other's various equations stated in the filings.

28

the calculation is:  8 (employees in class) x 11 (hours per week) x $12/hr x 13 (total approximate weeks in 3 month period) = **$13,728.00**.  (ECF No. 1 at 9.)

Most importantly, Defendants interpret the allegations in the FAC to be that Plaintiffs received no overtime pay all.  Essentially, Defendants seize upon the FAC ¶ 23 ("Defendants failed to compensate Plaintiffs for all overtime work") and the FAC ¶ 24 ("Direct Reconditioning did not pay Plaintiffs overtime wages or overtime premiums earned").  Thus, Defendants' interpretation of the FAC would be as follows: the employees were underpaid for normal hours worked, and then once the overtime hours for the day were reached, employees were not paid at all.  This interpretation is simply unreasonable and is inconsistent with Plaintiff's position.

C.  Plaintiffs' Arguments

As stated in Plaintiffs' motion to remand, under California's Department of Industrial Relations, Division of Labor Standards Enforcement Policies and Interpretation Manual (the "DLSE Manual"), section 49.2.1.2, two methods are proper for calculating overtime wages for piece-rate employees:

> 1.  Compute the regular rate [of] pay by diving the total earnings for the week, including earnings during overtime hours, by the total hours worked during the week, including the overtime hours.  For each overtime hour worked, the employee is entitled to an additional one-half (1/2) the regular rate for hours requiring time and one-half … This is the most commonly used method calculation.
>
> 2.  Using the piece or commission rate as the regular rate and paying one and one-half this rate for production during overtime hours.  This method is rarely used.

(ECF No. 8 at 12.)

The parties' briefing uses method one, because the parties base their overtime rate on minimum wage, not the piece or commission rate.  The Court accepts that method for calculation purposes.

As an example, as set forth in the DLSE Manual, consider employees working five extra overtime hours – for instance, two extra hours on Monday, one extra hour on Tuesday, and two extra hours on Friday – for a total of 42 workweek hours.  At a rate of ten dollars per hour, the employee would receive $420, absent overtime wages.  Adding in an additional one-half (1/2) of

9

1    wages per hour (five dollars), for each of the five extra hours, would cause $25 to be added to the

2    amount owed, resulting in an amount of $445.  (ECF No. 8 at 13.)

3            Plaintiffs point out, and the Court agrees, that Defendants did not follow this method.

4    Defendants calculated overtime wages by adding the full 1.5 times regular wages amount, rather

5    than adding the .5 times regular wages amount stated in the DLSE manual.  This was because

6    Defendants assumed that Plaintiffs allege receiving no wages at all for overtime work, as opposed

7    to no overtime premium.  Plaintiffs attempt to clarify in their reply: "Plaintiffs are simply

8    following accepted principles of law in calculating overtime 'wages' or 'premiums' owed.

9    Plaintiffs used both terms in their FAC when they alleged they were not paid 'overtime

10   compensation,' 'overtime wages,' or 'overtime premiums.'"  (ECF No. 17 at 6.)  The Court

11   agrees that a more reasonable interpretation of the FAC is simply that Plaintiffs are attempting to

12   receive compensation based on the correct overtime rate.  Defendants do not dispute that the

13   method proposed by Plaintiffs is, in fact, what is set forth in the DLSE manual.

14           Following the method set out in the DLSE Manual, the correct factor would be $4.00 per

15   overtime hour when regular pay is $8.00 per hour, and $4.50 per hour when regular pay is $9.00

16   per hour.  Using that factor, and assuming all other factors in Defendants' calculations are correct,

17   Plaintiffs arrive at a damages amount in their motion to remand of **$311,372.50**.[4]

18           The parties also dispute whether Defendants properly assumed Plaintiffs worked two extra

19   overtime hours per day.  The Court agrees that the FAC is unclear as to how many overtime hours

20   Plaintiffs worked per day.  (*See* FAC at ¶¶ 22–24.)  Plaintiffs dispute that they worked an average

21   of two overtime hours per day.  (ECF No. 17 at 3–5.)  However, regardless, in their motion to

22   remand, Plaintiffs accepted (it appears for argument's sake) Defendants' assumption of two

23   overtime hours per day.  Doing so, Plaintiffs arrive at a damages amount for Count 1 of

24   **$311,372.50.**  For the reasons stated, the Court accepts that damages amount for Count 1.

25   //

26   _____

27   [4] For example, for Defendants' calculation stated *supra*, for "Summer Months, June 1, 2011 through August 31, 2011", the calculation becomes:  8(employees in class) x 11 (hours per week) x $4/hr x 13 (total approximate weeks in 3 month period) = $4,576.00  (ECF No. 8 at 15.)

28

**III.   Count 2:  Minimum Wages**

A.   The FAC

The relevant allegations in the FAC are:

"Direct Reconditioning scheduled Plaintiffs to work nine (9) to (12) hour workdays once per month to work on BMW cars for ADESA, a company that provides and regulates auctions for vehicles.  On these days, approximately 100 to 200 BMW cars were brought to Direct Reconditioning to be detailed for auction.  After the auction, Direct Reconditioning and/or ADESA instructed the detailing crew, including Plaintiffs, to 're-touch' the vehicles without receiving pay for the time spent doing so."  (FAC at ¶ 22.)

"Plaintiffs worked approximately four (4) to five (5) days per week.  Plaintiffs estimate they worked over eight (8) hours per day during the week, and during the summer months, including June to mid-August, Plaintiffs worked approximately five (5) to six (6) days per week and more than forty (40) hours per week, without receiving overtime compensation.  Direct Reconditioning did not pay Plaintiffs overtime wages or overtime premiums earned."  (FAC ¶ 23.)

"Plaintiffs took home paychecks [of] between $500 to $600 per month while working upwards of 100 to 150 hours per month.  Plaintiffs were not paid the minimum wages of this State … There were times that Plaintiffs had to perform follow-up cleaning or wait for work and were not compensated at all for their time."  (FAC ¶ 24.)

B.   Defendants' Arguments

Defendants, in their Notice of Removal, state the amount of damages to be **$2,531,200.00**. (ECF No. 1 at 20.)  Defendants, when making this calculation, base their damages on the average payment per month of $550.00 and 150 hours as the hours worked per month.  They calculate what Plaintiffs should have been paid by multiplying the hours per month, 150 hours, by the rate of pay, $8 or $9.  They subtract the average paycheck of $550.000 from what they should have been paid, $1,200.00 (based on a rate of $8 per hour) or $1,350.00 (based on a rate of $9 per hour). The deficit amount, or underpayment, $650.00 or $800.00, respectively, is then multiplied by the number of employees for the given interval and the number of months in the interval. The

11

1   resulting amount is $1,265,600.00; that amount is doubled per the liquidated damages provision

2   in Cal. Labor Code § 1194.2, to arrive at the final amount of **$2,531,200.00**.

3         For example, for the period February 25, 2011 – November 9, 2011, Defendants'

4   calculations are:  ((150 x $8.00) - $550) x 8 employees x 8 months = $41,600.00  (ECF No. 1 at

5   10.)

6         In so doing, Defendants essentially rely upon the allegation in paragraph 24 of the FAC –

7   that Plaintiffs worked upwards of 100 to 150 hours per month, while using the high number of

8   150 hours.  Defendants also argue that this number is actually low "if Plaintiffs' allegations in the

9   previous paragraph, ¶23, are credited.  If, during the non-summer months, Plaintiffs worked four

10  to five days a week and worked over eight hours each day, Plaintiffs had to have worked, at a

11  minimum, over 156 hours per month.  There are 4.33 weeks in a month on average.  If Plaintiffs

12  worked during the non-summer months 4–5 days a week, they worked 19.5 days in a month on

13  average.  If they worked only eight hours a day (Plaintiffs, again, allege to have worked in excess

14  of eight hours in a day), they necessarily worked, on average 156 hours a month … For the

15  summer months, the minimum number, with no overtime hours, increases to over 190 hours [4.33

16  weeks x 5.5 days per week x 8 hours].  Using 150 hours as the average number worked per

17  month, based on Plaintiffs' allegations, is therefore very conservative."  (ECF No. 16 at 12–13.)

18        C.  Plaintiffs' Arguments

19        Plaintiffs argue, in their motion to remand, that Defendants incorrectly calculated this

20  amount because Defendants assumed Plaintiffs worked the highest number of hours alleged (150

21  hours in a range of 100 to 150) rather than the average number of hours (125).  Using 125 as the

22  number of hours worked, and otherwise accepting Defendants' calculations, Plaintiffs arrive at an

23  amount of **$1,767,600.00**.

24        The Court finds that Defendants offer the more appropriate number because in the FAC ¶

25  23, Plaintiffs indeed allege:  "Plaintiffs worked approximately four (4) to five (5) days per week.

26  Plaintiffs estimate they worked over eight (8) hours per day during the week, and during the

27  summer months, including June to mid-August, Plaintiffs worked approximately five (5) to six

28  (6) days per week and more than forty (40) hours per week, without receiving overtime

compensation." Simply put, it's not clear how many hours Plaintiffs are alleging they worked per week, or how this allegation (FAC ¶ 23) fits with the allegation in the FAC ¶ 24 that Plaintiffs worked upwards of 100 to 150 hours per month. Based on the allegations in ¶ 23, as Defendants point out, the number of hours worked per month could be quite a bit higher than 150 hours. In their reply, Plaintiffs themselves propose that the maximum number of damages could be Defendants' number – $2,531,200.00 – with the possibility of an increase for the period between February 25, 2015, and March 30, 2015. (ECF No. 17 at 7.)

For those reasons, the Court accepts the proposed amount for Count 2 which Defendants state in their notice of removal: **$2,531,200.00**.

### IV.      Remaining Counts & Attorney's Fees

For Count 3: Failure to Provide Rest Breaks, Plaintiffs do not dispute Defendants' proposed amount. Therefore, the Court accepts Defendants' proposed amount from their notice of removal for Count 3: **$311,372.50**.

For Count 4: Failure to Provided Itemized Wage Statements, Defendants' proposed amount in their Notice of Removal is: $112,400. Plaintiffs argue only: "Defendants summarily stated Plaintiffs and the putative class are owed $112,400 in wage statement violations without providing the number of pay periods or violations that occurred during the one-year statute of limitations." (ECF No. 8 at 11.) Defendants have attached payroll records showing the number of employees for the relevant period and the penalties claimed for each. (ECF No. 16, Ex. A-1.) The Court accepts Defendants' proposed amount from their notice of removal, for Count 4: **$112,400.00**.

For Count 5: Waiting Time Penalties, Defendants' proposed amount in their Notice of Removal is $156,240.00. Plaintiffs again argue that Defendants summarily stated the amount of waiting time penalties without providing the factual basis underlying their calculation. (ECF No. 8 at 18.) For argument's sake, the Court will accept Defendants' proposed amount from their notice of removal for Count 5: **$156,240.00**.

The parties do not provide an independent proposed amount for Count 6: California's UCL, presumably because the amount for that claim is incorporated into the other counts in the

FAC. The parties do not provide proposed amounts for Counts 7 and 8, on the basis that claims brought under the Private Attorneys General Act are generally not included in the removal inquiry.  (ECF No. 1 at 14, n. 4.)  *See Baumann v. Chase Inv. Serv. Corp.*, 747 F.3d 1117, 1122 (9th Cir. 2014); *Thurman v. Bayshore Transit Mgmt., Inc.*, 203 Cal. App. 4th 1112, 1148 (2012).

Added together, the amounts for Counts 1 through 6 are: **$3,422,585.00.**

Both parties agree that the attorney's fees, if they are awarded, would be 25% of the total amount of damages.  (ECF No. 8 at 19; ECF No. 16 at 17.)  For jurisdictional purposes, attorney's fees are taken into consideration.  *Guglielmino v. McKee Foods Corp.*, 506 F.3d 696, 701 (9th Cir. 2007); *Sanchez v. Wal-Mart Stores, Inc.*, 2007 WL 1345706, at *2 (E.D. Cal. May 8, 2007).  Adding 25% for attorney's fees, the final amount is: **$4,278,231.25**.

As discussed above, Plaintiffs proffer that, if the amount in controversy at the time the complaint was filed is not used, the latest date used should be March 30, 2015.  The Court declines to undertake an analysis of what damages would accrue for roughly that month-long period between February 25, 2015, and March 30, 2015.  However, with an amount in controversy before attorney's fees of $3,422,585.00, an additional amount of $577,415.00 would have to be added for that period, to reach $5,000,000 including attorney's fees.  It does not appear that amount (or more) could accrue between February 25, 2015 and March 30, 2015.

In any event, the strongest point to draw from the above discussion is that the parties are engineering amounts based on speculation.  The amounts proposed by the parties are unsubstantiated.  There is little to no evidence before the Court of how many hours, either regular or overtime, Plaintiffs worked during the four-year period.  One obvious inconsistency is in the Defendants' calculations for Counts 1 and 2.  Based on Defendants' calculations, if Plaintiffs work two hours of overtime each day (Count 1), Plaintiffs must work ten hours for each of those days.  However, Defendants' calculations for Count 2 relying on 150 hours of work per month, are not consistent with an estimate of ten hours per work each day.

So on the one hand, the Court could increase the average number of hours worked per month, to well above 150, to make that number fit with an assumption that Plaintiffs worked two overtime hours per day.  On the other hand, there is no evidentiary support for the fact that

14

1    Plaintiffs actually worked two overtime hours each day, or that Plaintiffs worked an average of

2    150 hours per month.  "In the event that the plaintiff does contest the defendant's allegations,

3    both sides submit proof and the court decides, by a preponderance of the evidence, whether the

4    amount-in-controversy requirement has been satisfied."  *Owens*, 135 S. Ct. at 550.

5         The only evidence submitted by Defendants is the declarations of the treasurer of Direct

6    Reconditioning, LLC, Donald K. Cameron, which state the number of employees employed at

7    various intervals in the four-year period prior to the filing of the complaint, on February 25, 2011.

8    (ECF No. 1, Ex. 7; ECF No. 16, Ex. A.)  Attached to the later-filed declaration (ECF No. 16, Ex.

9    A) are payroll records showing employees for whom Cal. Labor Code § 226 penalties are

10   requested, for the period February 25, 2014, through February 25, 2015.  (ECF No. 16, Ex. A-1.)

11   Those records do not show either how many overtime hours are worked per day, or how many

12   hours are worked per month during the four-year period.

13        The evidence submitted by Plaintiffs is declarations from two former employees, Mr.

14   Cieri and Mr. Rickwalt, with attached production records and paychecks.  (ECF Nos. 11 & 12; 18

15   & 19.)  Mr. Cieri's supplemental declaration states, among other things, that he "typically worked

16   four (4) to eight (8) hours per day.  [He] did not work ten (10) hours per day, or two overtime

17   hours per day, on a daily basis during [his] employment at Direct Reconditioning ... For instance,

18   during the two week pay period of August 18, 2014 through August 29, 2014, [he] worked

19   approximately four (4) to seven (7) hours per day.  For the pay period of September 1, 2014

20   through September 11, 2014, [he] worked between four (4) to six (6) hours per day, with the

21   exception of one day when [he] worked eleven (11) hours.  There were times near Adesa's

22   auction day that [he] and other employees had to work longer than eight (8) hours to get all the

23   work.  In 2014 and 2015, [he] generally worked four to eight hours per day worked."  (ECF No.

24   18 ¶ 3.)  That declaration also attaches production records and paychecks, though it's not clear

25   that these attachments confirm the hours stated in Mr. Cieri's supplemental declaration.

26        The supplemental declaration from Mr. Rickwalt, which also attaches production records

27   and paychecks, states roughly the same as Mr. Cieri, including that he "typically worked four (4)

28   to eight (8) hours per day.  [He] did not work ten (10) hours per day, or two overtime hours per

day, on a daily basis during [his] employment at Direct Reconditioning." (ECF No. 19 ¶ 3.)

The figures proposed by Defendants, in their removal notice (roughly $5.1 million) and opposition (roughly $5.5 million), are just slightly over the required amount in controversy. Though the submitted evidence from both parties is minimal, what has been submitted substantiates Plaintiffs' position that Defendants' proposed amounts are too high. The submitted evidence, albeit minimal, preponderates toward an amount below $5,000,000.

### CONCLUSION

For the reasons set forth above, Plaintiffs' Motion to Remand (ECF No. 8) is GRANTED.

Plaintiffs also request an order granting costs, including attorney's fees, associated with removal. (ECF No. 8 at 8.) Such costs may be granted when a defendant lacked an objectively reasonable basis for removal. *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). The Court does not find Defendants lacked an objectively reasonable basis for removal, and so the request for costs is DENIED.

Dated: December 1, 2015

_____
Troy L. Nunley
United States District Judge

16